UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARK C. BROOKES, Successor Administrator of the ESTATE OF GREGORY OTIS STAMPER, DECEASED, 579 High Street Worthington, OH 43085 | Case No. 2:13-cv-516 |
| | Judge |
| | Magistrate Judge |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY DEMAND** |
| MYRON SHANK, M.D., In his individual capacity Former Medical Director of Allen Correctional Institution 431 South Jameson Avenue Lima, Ohio 45805, | |
| JOHN DESMARAIS, M.D., In his individual capacity Former State Medical Director Ohio Department of Rehabilitation and Correction 103 Highland Avenue Washington Court House, Ohio 43160, | |
| ANNETTE CHAMBERS-SMITH, In her individual capacity Former Chief of the Bureau of Medical Services Ohio Department of Rehabilitation and Correction 770 West Broad Street Columbus, Ohio 43222, | |

| | |
|---|---|
| STUART HUDSON, | : |
| In his individual capacity | : |
| Chief of the Bureau of Medical | : |
| Services | : |
| Ohio Department of Rehabilitation and | : |
| Correction | : |
| 770 West Broad Street | : |
| Columbus, Ohio 43222, | : |
| | : |
| and | : |
| | : |
| ANDREW EDDY, M.D., | : |
| In his individual capacity | : |
| State Medical Director | : |
| Ohio Department of Rehabilitation and | : |
| Correction | : |
| 770 West Broad Street | : |
| Columbus, Ohio 43222, | : |
| | : |
| Defendants. | : |

## I. PRELIMINARY STATEMENT

1. Imagine your body has been burned, the slightest touch causing agonizing pain. Unfortunately for Gregory Stamper, this is precisely how he felt for two years – before he ended the pain by taking his life.

2. This civil rights case challenges the failure of prison officials to provide Stamper with constitutionally required medical treatment – specifically, pain medication. Stamper suffered from acute peripheral neuropathy, a disease that damages the nervous system, causing excruciating pain. Stamper's pain, which was nearly constant, spread from his fingers and toes to almost everywhere in his body. His skin was so sensitive that he could not bear to be in an air-conditioned room because the movement of air against his skin caused extreme pain.

3. Neurontin, a non-narcotic medication, proved effective in easing Stamper's pain. Although that medication did not completely block Stamper's pain, it relieved much of his agony.

4. Dr. Myron Shank, the former medical director at Allen Correctional Institution ("ACI") where Stamper was incarcerated, knew about Stamper's condition and that Neurontin helped control Stamper's pain. But in August 2009, Shank discontinued the medication, forcing Stamper to suffer for ten months without pain relief. Shank did so to punish Stamper for having been found with two pain pills, a Neurontin and an Ultram, in his cell, which suggested that Stamper was looking to sell the medication (which, as will be discussed later, was not true). Shank withdrew the medication abruptly, even though there were less restrictive alternatives available, like crushing the medication and making sure Stamper consumed it in front of corrections staff.

5. However, in 2010 a court-appointed monitor overseeing the Ohio prison health care litigation, ordered Shank to put Stamper back on Neurontin; Shank complied for a while. But in April 2011, Shank discontinued the medication for a final time for no medical reason, refusing to provide it despite Stamper's urgent pleas for pain relief.

6. Unable to take the pain any longer, Stamper killed himself on June 1, 2011.

7. Shank is not the only person who acted with deliberate indifference towards Stamper's pain. The other defendants in this case – John Desmarais, M.D., Annette Chambers- Smith, Stuart Hudson and Andrew Eddy, M.D.– were/are Central Office employees who knew that Shank had a reputation for withholding pain medication that bordered on being sadistic while employed as a contract physician at another prison.

Despite their knowledge, Desmarais, Chambers-Smith, Hudson and Eddy, hired Shank to work at Allen Correctional Institution, promoted him to Medical Director of that facility, and then sanctioned Shank's withholding of medication from Stamper at ACI. Accordingly, they, too, knew of, but disregarded, Stamper's suffering.

## II.  JURISDICTION AND VENUE

8.     This claim is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983. This Court has jurisdiction to hear the claim under 28 U.S.C. §§ 1331, 1343 (3) and (4).

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b), S.D. Ohio Local Rule 82.1, because three of the Defendants reside in Franklin County, Ohio.

## III.  THE PARTIES

10.    Mark C. Brookes is the administrator of the Estate of Gregory Otis Stamper.

11.    Defendant Myron Shank was, at all times relevant to this action, employed by the state of Ohio as Physician or Medical Director of ACI and as such was responsible for Stamper's medical care.   Shank is sued in his individual capacity.

12.    Defendant John Desmarais was, at all times relevant to this action, employed by the state of Ohio as the State Medical Director at ODRC.  Desmarais is sued in his individual capacity.

13.    Defendant Annette Chambers-Smith was, at all times relevant to this action, employed by the state of Ohio as the Chief of the Bureau of Medical Services ("BOMS") at the Ohio Department of Rehabilitation and Correction.  Chambers-Smith is sued in her individual capacity.

14.    Defendant Stuart Hudson was, at all times relevant to this action, employed by the state of Ohio as the Chief of BOMS.  Hudson is sued in his individual capacity.

4

15. Defendant Andrew Eddy was, at all times relevant to this action, employed by the state of Ohio as the State Medical Director at ODRC. Eddy is sued in his individual capacity.

## IV.  FACTS

### Stamper's Pain

16. Stamper entered the Ohio prison system in 1996.

17. In 2008, Stamper began to experience burning pain in his back, hands, and neck and numbness in both feet. In August 2008, the ACI Medical Director at that time, Dr. Ashwin Amin, prescribed Neurontin.

18. Neurontin is an anti-convulsant, non-narcotic medicine primarily used to treat seizure disorders.  However, Neurontin has also proven effective at treating nerve pain. Neurontin relieves pain by changing the way the body senses it.

19. Initially, Neurontin was effective in controlling Stamper's pain symptoms. But in early 2009, Stamper's pain increased and spread through his extremities. His nerves felt like they were on fire.

20. In February 2009, Stamper complained of severe chest pain radiating to his neck, jaw, hands and feet. Concerned that Stamper was suffering a heart attack, ACI had him rushed by emergency vehicle to the Ohio State University Medical Center ("OSUMC"). After conducting several tests, OSUMC doctors ruled out a heart attack but instead found that Stamper was suffering from severe peripheral neuropathy and prescribed Neurontin along with Indocin, a non-narcotic pain reliever.

21. When Stamper returned to ACI, Dr. Amin prescribed Neurontin and Ultram, a non-narcotic painkiller, for Stamper's pain.

22. Stamper was referred to and seen by a neurologist at the Corrections Medical

Center ("CMC") in April 2009. The neurologist diagnosed Stamper with acute peripheral neuropathy and recommended an increased dosage of Neurontin. Dr. Amin accepted the recommendation and increased Stamper's dosage of Neurontin.

23. In September 2009, Stamper received an electrodiagnostic nerve conduction study at CMC. This study determines the extent to which nerves are damaged. In Stamper's case, the study confirmed that he had peripheral neuropathy.

24. The pain Stamper experienced constituted a serious medical need for Eighth Amendment purposes.

### Shank's Hiring at ACI

25. In July 2009, Chambers-Smith and Desmarais hired Shank as a physician at ACI. Before beginning work at ACI, Shank worked as a contract physician at Toledo Correctional Institution ("TCI"). TCI inmates filed numerous complaints against Shank for improper medical care, including abruptly withholding pain medication. Chambers-Smith and Desmarais knew of these complaints when they decided to hire Shank to work at ACI.

26. Once at ACI, Shank became Stamper's treating physician.

### The First Discontinuation of Stamper's Pain Medication

27. During the summer of 2009, Stamper needed more pain medication than Shank would prescribe. To supplement his treatment regiment, Stamper traded a bag of cookies with another inmate in for two pain pills, one Neurontin and one Ultram. Stamper planned on taking those pills at night when his pain was especially bad.

28. However, corrections officers found the two pills in Stamper's cell and wrote him a conduct report for misuse of medication. The Rules Infractions Board, the

administrative body that hears conduct reports in the prison system, recommended that Stamper's medications be crushed or liquefied.  Despite that recommendation, Shank discontinued Neurontin and Ultram altogether on August 5, 2009, telling Stamper "Pain 'hurts', but it doesn't 'hurt' you."  Shank accused Mr. Stamper of having an addiction problem.

29.  Stamper suffered immensely as a result of the discontinuation of Neurontin and Ultram from August 2009 to June 2010.

### The Reinstatement of Stamper's Pain Medication

30.  By April 2010, the level of medical care provided by Shank at ACI became a concern of the federal monitor in *Fussell v. Wilkinson*, Case No. C-1-03-704 (S.D. Ohio), the federal class action settlement that worked to improve health care for Ohio prisoners. A significant rise in inmate complaints at ACI revealed concerns about Shank's clinical performance, interpersonal skills and professional judgment. The concerns included Shank's regular cancellation of medications based on allegations of substance addiction.

31.  During site visits in May and June 2010, Dr. Ron Shansky, M.D., chief physician on the *Fussell* monitoring team, discussed Stamper's care with Shank.

32.  Shortly after his meetings with Dr. Shansky, Shank put Stamper back on Neurontin – but not Ultram – conditioned upon Stamper enrolling in ACI's Recovery Services program for substance abuse.  Stamper agreed to do so and met with recovery services.

33.  Defendant Desmarais accompanied Dr. Shansky on his May 2010 visit and witnessed Dr. Shansky's conversations with Shank.

34. After Stamper's initial interview with Recovery Services, the program's director, John Hall, determined that Stamper was not an addict and did not need recovery services treatment.

### Central Office's Deliberate Indifference to the Care Shank Provided

35. Defendants Desmarais and Chambers-Smith promoted Shank to ACI Medical Director in July 2010. Inmate complaints for improper or inadequate medical care continued to rise during the first year Dr. Shank served as Medical Director at ACI. Complaints related to a delay or denial of medication rose by 24 percent.

36. At the end of July 2010, after Shank's promotion to ACI Medical Director, Defendant Hudson replaced Chambers-Smith as Chief of BOMS.

37. In August 2010, Defendant Desmarais became a part-time assistant State Medical Director.

38. In January 2011, Defendant Eddy replaced Desmarais as State Medical Director.

39. Neither Hudson nor Eddy investigated Shank's care despite the rise of complaints in 2010 and early 2011 about him withholding pain medication from inmates under his care at ACI.

### The Final Discontinuation of Stamper's Pain Medication

40. In April 2011, Shank discontinued Stamper's Neurontin prescription for a final time, claiming that Stamper had refused substance abuse treatment because none was documented in Stamper's medical chart. Shank did not contact Recovery Services to investigate.

8

41. Stamper begged for his medication to be reinstated but Shank refused to budge.

42. Stamper did not receive pain management from April 26, 2011 until his death on June 1, 2011.

43. With no medication to manage his pain, Stamper suffered constant excruciating pain that limited his daily life activities.

44. Stamper's severe pain was a serious medical condition.

45. Shank was aware of Stamper's serious medical condition, specifically that Stamper was suffered constant agonizing pain. Yet, Shank refused to put Stamper back on Neurontin or any other pain medication.

46. Stamper continued to report his pain to prison staff and requested medication to control it after his Neurontin prescription was discontinued.

47. On May 31, 2011, Shank canceled a scheduled appointment Stamper had requested. Shank wrote in Stamper's medical chart, "cancel DSC no other options available." On information and belief, "DSC" is the abbreviation for "doctor's sick call."

48. On June 1, 2011, prison officials found Stamper unresponsive in his cell. He had committed suicide by hanging.

### Shank's Resignation

49. BOMS placed Shank on administrative leave shortly after Stamper's suicide. A subsequent BOMS investigation concluded that Shank's care was deficient.

50. Shank resigned from his position as Medical Director at ACI on June 20, 2011.

## V.  CAUSE OF ACTION - 42 U.S.C. § 1983 (DENIAL OF MEDICAL CARE)

51.  Shank has acted with deliberate indifference to Stamper's serious medical needs by refusing to provide pain medication.   Shank, acting under color of state law, deprived Stamper of rights, privileges and immunities secured by the Eighth Amendment to the United States Constitution including, but not limited to, the right to be free of cruel and unusual punishment.

52.  Defendants Chambers-Smith, Desmarais, Hudson, and Eddy acted with deliberate indifference to Stamper's serious medical needs by ignoring complaints about Shank's care and allowing him to remain in a position to cause harm to Stamper and other ACI patients.  Defendants Chambers-Smith, Desmarais, Hudson and Eddy, acting under color of state law, deprived Stamper of rights, privileges and immunities secured by the Eighth Amendment to the United States Constitution including, but not limited to, the right to be free of cruel and unusual punishment.

## VI. JURY DEMAND

53.  Plaintiff requests a jury trial on all claims triable to a jury.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.  Compensatory damages in an amount to be shown at trial;

B.  Punitive damages against each Defendant in an amount to be shown at trial;

C.  Award Plaintiff reasonable attorneys' fees, costs, and disbursements; and

D.  Grant to Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,


<u>/s/ David A. Singleton</u>
David A. Singleton #0074556
Trial Attorney for Plaintiff
Rickell Howard #0081982
Co-Counsel for Plaintiff
Ohio Justice & Policy Center
215 E. 9th Street, Suite 601
Cincinnati, OH 45202
(513) 421-1108
(513) 562-3200 – fax
dsingleton@ohiojpc.org
rhoward@ohiojpc.org