```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

**MARK C BROOKES,**

      **Plaintiff,**

   v.                                        **Case No. 2:13-cv-516**
                                                         **Judge Sargus**
                                                         **Magistrate Judge King**

**MYRON SHANK,** *et al.*,

      **Defendants.**

## REPORT AND RECOMMENDATION

Mark C. Brookes, administrator of the Estate of Gregory Otis Stamper, filed this action under 42 U.S.C. § 1983 on behalf of the decedent (hereafter "plaintiff"), a former prisoner at the Allen Correctional Institution ("ACI"), alleging that defendants were deliberately indifferent to plaintiff's medical needs in violation of the Eighth Amendment to the United States Constitution.  On February 7, 2014, all the claims were dismissed, except the claim of deliberate indifference asserted against defendant Myron Shank, M.D., Ph.D. *Order*, ECF 26.  This matter is now before the Court on *Defendant, Dr. Myron Shank's Motion for Summary Judgment* ("*Defendant's Motion*"), ECF 42.  Plaintiff opposes *Defendants' Motion*, *Plaintiff's Response and Memorandum in Opposition to Defendant's Motion for Summary Judgment* ("*Plaintiff's Response*"), ECF 52, and defendant has filed a reply. *Defendants' Reply*, ECF 57.  At the Court's request, ECF 59, plaintiff filed a *Supplemental Response*, ECF 60, and defendant filed a

*Supplemental Reply*, ECF 63.  For the reasons that follow, it is **RECOMMENDED** that *Defendants' Motion*, ECF 42, be **GRANTED**.

I.  Background

In March 2008, plaintiff reported chronic low back pain, numbness in both feet, and intermittent dizziness. *Plaintiff's Response*, Exhibit A, p. 19.  He was slow to arise from a chair and ambulated with difficulty. *Id.*  Plaintiff continued to report pain throughout 2009.  Plaintiff was taken to the emergency department in February 2009 for pain radiating to his neck, jaw, shoulder, and left arm and hand. *Id.* at Exhibit A, p. 27.  Plaintiff reported numbness in his extremities on April 24, 2009. *Id.* at Exhibit A, p. 23.  On June 1, 2009, plaintiff reported trouble with balance and pain in his hands and the thoracic area of his back. *Id.* at Exhibit A, p. 1.  He reported dizziness and difficulty with balance in July 2009. *Id.* at Exhibit A, pp. 9, 15, 35.  On September 26, 2009, plaintiff reported a burning, throbbing pain in his fingers and the skin on his feet. *Id.* at Exhibit A, pp. 1, 33.

On August 4, 2009, plaintiff arrived at pill call and "acted like he took his pills and left."  ECF 42-2, *PAGEID* 283.  However, plaintiff was searched when pill call was completed and was found to be in possession of medication, Neurontin (Gabapentin) and Ultram (Tramadol). *Id.*  Plaintiff was found guilty of the resulting rules violation on August 5, 2009. *Id.* at *PAGEID* 284.  At the disciplinary hearing, plaintiff admitted to having the pills and stated that he "traded a bag of cookies for pills." *Id.*  Plaintiff was issued a verbal reprimand "with stipulation of doctor issuing medication to Mr.

2

Stamper based on his medical conditions.  Crushing pills or liquid forms may be an option to consider." *Id*.  Plaintiff's prescriptions for Tramadol and Gabapentin were cancelled on August 4, 2009, because of "cheeking."[1]  *Id*. at *PAGEID* 287.

Plaintiff treated with defendant Dr. Shank on August 6, 2009.  Dr. Shank prescribed Carbamazepine for six months as an alternative to Tramadol and Gabapentin.  *Id*. at *PAGEID* 288-89.  Plaintiff complained of the denial of medical attention, in response to which Dr. Shank "pointed out that pain 'hurts' but will not 'hurt' him." *Id*. at *PAGEID* 289.  Plaintiff also requested an EMG and a neurology consult, which Dr. Shank ordered.  *Id*.  Plaintiff was seen for a neurology consult on August 7, 2009.  *Id*.  It was recommended that plaintiff undergo an MRI of the brain and spine and an EMG for sensory neuropathy.  *Id*. at *PAGEID* 294-95.

Plaintiff underwent an EMG on September 23, 2009.  *Plaintiff's Response*, Exhibit A, p. 7.  Plaintiff was diagnosed with generalized sensory and motor peripheral neuropathy.  *Id*. at p. 8.

Plaintiff treated with Dr. Shank on October 5, 2009, after undergoing cataract surgery.  ECF 42-2, *PAGEID* 300.  With regard to his neuropathy, plaintiff reported that Carbamazepine made him "queasy" and offered no benefit.  *Id*.  Dr. Shank discontinued Carbamazepine, prescribed Lamotrogine, and postponed plaintiff's follow up with neurology at plaintiff's request due to discomfort

---

[1] "'Cheeking' is a term used to describe an inmate's behavior of hiding a pill or capsule in his cheek, or other area of his mouth after ingesting it, not swallowing the furnished pill as directed, and instead spitting it out after his return to his cell." *Affidavit of Helen Gwendolyn Gerhard, Certified Nurse Practitioner* ("*Gerhard Affidavit*"), ECF 42-9, ¶ 11.

3

associated with the travel required. *Id*. On October 19, 2009, plaintiff refused an MRI, stating "I can't do it," but said he would consider it if Dr. Shank reconsidered the medication restrictions. *Id*. at *PAGEID* 303.

Dr. Shank again prescribed Lamotrogine on December 15, 2009. *Id*. at *PAGEID* 301, 304. Dr. Shank noted that plaintiff had previously acknowledged selling Tramadol and Gabapentin for a bag of cookies and commented that plaintiff's "behavior is inconsistent [with] his [complaints of] intolerable pain, if cookies were more important to him than the alleged pain. [Patient] being given alternate [treatment.]" *Id*.

On February 23, 2010, plaintiff asked for Tramadol and Gabapentin for worsening pain and coordination caused by his neuropathy. *Id*. at *PAGEID* 305. Plaintiff refused an MRI of the brain and spine. *Id*. at *PAGEID* 306. Dr. Shank recommended an MRI of the brain to diagnosed a potentially treatable condition, but noted that plaintiff was "adamant against outside tests/consults" and "declines all outside trips." *Id*. at *PAGEID* 305. Dr. Shank concluded that he could not justify plaintiff's request because of his abuse, *i.e.*, trading medication for cookies, and unwillingness to pursue potentially treatable causes of his symptoms. *Id*.

In June 2010, plaintiff reported continued pain in his upper back and shoulder blades and pain and numbness in his hands. *Plaintiff's Response*, Exhibit A, p. 31. On June 9, 2010, plaintiff reported to Dr. Shank "some benefit from indomethacin," stating "it's better than nothing." He requested crushed Gabapentin. ECF 42-2, *PAGEID* 307.

Dr. Shank noted that plaintiff had agreed he would not get another chance if he misused his medication. *Id*. at *PAGEID* 307-09. According to Dr. Shank, plaintiff "failed alternative [treatment] options. Pain is primarily nocturnal. [Plaintiff] willing to work [with] polysubstance abuse program." "Dr. Shank agreed to recommendations provided by input from a court appointed physician-monitor" and prescribed Gabapentin in crushed form and ordered a substance abuse consult. *Defendant's Reply*, p. 5; ECF 42-2, *PAGEID* 307-09. Dr. Shank also ordered restrictions to a low bunk; no lifting greater than 20 pounds; no standing longer than 30 minutes; and no pushing, pulling, or bending for six months. ECF 42-2, *PAGEID* 307-09. Dr. Shank's referral to Recovery Services states the following: "Pt. [with] peripheral polyneuropathy, apparently familial. Pt. misused gabapentin and tramadol [approximately] 1 y ago, selling for cookies. He has cooperated [with] alternative [treatments,] [illegible] failed. He has agreed to crush order for gabapentin and to be evaluated and, if appropriate, monitored by you." *Id*. at *PAGEID* 310.

On July 6, 2010, plaintiff was interviewed by John Hall at Recovery Services. *Id*. at *PAGEID* 325-26. Plaintiff's score on the drug screen indicated "no need for service;" plaintiff's score on the CMR Instrument was "very low." Plaintiff was referred to AOD educational programming, *id*., a voluntary 12-week program. *John T. Hall Deposition*, ECF 42-7, pp. 26-27.

On March 28, 2011, Dr. Shank performed a client review and noted the following:

> Pt. [with] peripheral polyneuropathy. Has received low bunk, no standing > 30 min., no lifting > 20, and no push,

5

> pull, or bend.  This was intended to be relatively short term, so that his meds could be reevaluated, but I see no documentation of that taking place.  I do not have documentation of compliance [with] Recovery Services.

ECF 42-2, *PAGEID* 313.  In an addendum, Dr. Shank commented that, "[p]er new policy, unable to receive gabapentin > 600 mg [illegible]." *Id*.  Dr. Shank ordered Gabapentin 600 mg "per new policy," "Gabapentin levels 1 wk," and "[n]otify pt. of Rx change."  *Id*. at *PAGEID* 314. Dr. Shank emailed Matthew Schweyer in Recovery Services that same day and asked if plaintiff had "been compliant with Recovery Services." *Id*. at *PAGEID* 323.  Mr. Schweyer responded that plaintiff "has not been involved in any Recovery Services treatment programs to include 12 step fellowship meetings."  *Id*.  Dr. Shank inquired further as to whether Recovery Services received a referral for plaintiff.  *Id*. at *PAGEID* 322.  Mr. Schweyer confirmed that a referral had been received and noted the following: "We screened him and he wanted nothing to do with Recovery Services.  He did not see himself as having a problem. Seems to me that he had a positive urinalysis for cocaine while in custody, though, if I remember correctly.  I will check again when I get in." *Id*.  Mr. Schweyer confirmed on March 29, 2011, that plaintiff "had two positive urine screens since he has been incarcerated.  Both were for cocaine." *Id*.  Mr. Schweyer did not mention that the positive drug screens had occurred in 1997 and 1998. *Id*. at *PAGEID* 328-34.

Plaintiff was evaluated in the Chronic Care Clinic on April 13, 2011 by Helen Gerhard, CNP, for hypertension, hypothyroidism, hepatitis C, and hyperlipidemia.  *Id*. at *PAGEID* 316.  Ms. Gerhard notified plaintiff of the new policy related to Gabapentin and noted

6

that "unit dosages in excess of 600 milligrams, or daily doses in excess of 1,800 milligrams were found not to be any more effective for the treatment of chronic pain as were dosages of 600 milligrams or less." *Gerhard Affidavit*, ¶ 17.  Plaintiff responded that Gabapentin "was not effective in relieving his pain at the current dosages anyway" and that she should just cancel the Gabapentin completely. *Id*.  Ms. Gerhard noted that plaintiff "[h]as not complied [with] contract will remove pain meds."  ECF 42-2, *PAGEID* 316.  She cancelled plaintiff's prescription for Gabapentin and Indocin "until pt. has complied [with] contract."  *Id*. at *PAGEID* 315.

On April 26, 2011, Dr. Shank noted that, according to Recovery Services, plaintiff had refused to participate in the program even though his participation was a condition of his continued treatment with Gabapentin and even though he had agreed that he would not receive another chance.  *Id*. at *PAGEID* 313.  "Pt. reportedly does not perceive a substance abuse problem despite 2 separate urines [positive] for cocaine.  No further gabapentin."  *Id*.  *See also PAGEID* 318 ("No further gabapentin – do not restart.").

Plaintiff filed an informal complaint on May 15, 2011. *Plaintiff's Response*, Exhibit A, p. 81.  Plaintiff stated that he suffered from a neuropathic condition that causes intense and constant pain.  *Id*.  Plaintiff reported that he "can barely function" and that he has "a difficult time making it to the chow hall due to the intense pain associated with movement."  *Id*.  He requested the immediate reinstatement of his medication.  Plaintiff was informed that, if he wished to continue his medication, he "should follow through with

7

recommendations of Dr. Shank." *Id*. It was explained that Dr. Shank stopped the medication because plaintiff was unwilling to pursue potentially treatable causes of his symptoms. *Id*. In a notification of grievance dated May 25, 2011, plaintiff stated that he cannot travel because he is "physically unable to withstand the trip without adequate pain management medication which Dr. Shank refuses to provide." *Plaintiff's Response*, Exhibit F, p. 2

In an undated letter to "Mr. Hall," plaintiff stated the following:

> On Wednesday, April 13th, during a routine chronic care visit, I was told that my Neurontin medication would be canceled immediately.  In the absence of my medication my condition has deteriorated dramatically.  I have suffered what seems to me to be a series of seizures or strokes.  Sometimes more than one a day.  I suffered loss of muscle control in my hands, arms, legs, and most alarmingly in my face.  Also difficulty with my balance, and nearly unbearable neuropathy pain.

ECF 42-2, *PAGEID* 324.

Plaintiff was evaluated by Nurse Practitioner Gerhard in the Chronic Care Clinic on May 24, 2011. *Id*. at *PAGEID* 319. Plaintiff reported continued neuropathy pain that was spreading to his face. *Id*. However, Ms. Gerhard saw no objective indicators of pain. *Deposition of Helen Gwendolyn Gerhard*, ECF 42-5, p. 6. Plaintiff was referred to Dr. Shank "for [bottom bunk restriction] + pain meds + round trip for MRI for [diagnosis] of problem." ECF 42-2, *PAGEID* 318. Ms. Gerhard explained that, although plaintiff "was not in pain," she referred him to Dr. Shank because "he was stating that he was in pain" and she "did not know the full extent of his neuropathy." *Deposition of Helen Gwendolyn Gerhard*, p. 15.

8

Dr. Shank performed a chart review on May 31, 2011, and noted the following: "MRI is not indicated in this pt. [with] known . . . peripheral polyneuropathy.  Pt. has failed, misused, or been non-compliant [with] terms of Rxs for pain.  There are no additional options available.  Cancel [doctor's sick call]."  *Id*. at *PAGEID* 320.  Dr. Shank ordered: "Cancel DSC [with] me.  There is no indication for MRI for known . . . peripheral polyneuropathy and pt. has failed, misused, or been noncompliant [with] conditions for Rx for pain.  No other options available."  *Id*. at *PAGEID* 321.

On the next day, plaintiff was found unresponsive in his cell; he had committed suicide by hanging.  *Id*.

## II.  Standard

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Pursuant to Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*.  In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

9

(1986). However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III. Discussion

This is an action under 42 U.S.C. § 1983 claiming deliberate indifference in connection with an alleged denial of medical care. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or

> the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. A *prima facie* case under § 1983 requires evidence of (1) conduct by an individual acting under color of state law, and (2) the deprivation of a right secured by the Constitution or laws of the United States. *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Section 1983 merely provides a vehicle for enforcing individual rights found elsewhere and does not itself establish any substantive rights. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

In the case presently before the Court, plaintiff alleges that Dr. Shank acted with deliberate indifference to his medical needs in violation of the Eighth Amendment to the United States Constitution. Plaintiff specifically alleges that Dr. Shank was deliberately indifferent to plaintiff's medical needs because, on "May 31, 2011, Shank canceled a scheduled appointment [plaintiff] had requested" and "refused to put [plaintiff] back on Neurontin or any other pain medication" even though Dr. Shank was "aware of [plaintiff's] serious medical condition, specifically that [plaintiff] [] suffered constant agonizing pain." *Complaint*, ¶¶ 45, 47.[2]

---

[2] This Court previously held that only the acts taken by Dr. Shank "within the two-year period immediately preceding the filing of the complaint" could be considered as part of plaintiff's claim. *Report and Recommendation*, ECF 25, p. 4; *Order*, ECF 26.

11

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. In order to prevail on his claim, plaintiff must prove that Dr. Shank acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). This standard includes both an objective and a subjective component. The objective component requires that a plaintiff establish the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component requires that a plaintiff establish that the "official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). However, "a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835). "Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id*. (quoting *Farmer*, 511 U.S. at 836).

Defendant first argues that plaintiff has failed to present evidence of the objective component. Defendant specifically argues that "no objective evidence can be produced that sufficiently demonstrates the alleged severity of [plaintiff's] chronic neuropathic pain so as to establish it as a serious medical need under the objective component of a deliberate indifference claim." *Defendant's Motion*, p. 14. "A serious medical need is 'one that has been

12

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). Although defendant argues that plaintiff did not suffer from a serious medical need, he concedes that plaintiff was diagnosed with peripheral neuropathy and was treated for related pain over the course of several years. Courts have found that a diagnosis of neuropathy accompanied by evidence of pain qualifies as a serious medical need. *See Ruley v. Corr. Corp. of Am.*, No. Civ. 11-36-ART, 2013 WL 1815039, at *4 (E.D. Ky. Apr. 29, 2013) (citing *Williams v. Guzman*, 346 F. App'x 102, 105 (7th Cir. 2009) (holding that a plaintiff with diagnosed neuropathy established a serious medical need)). A reasonable jury could therefore find that plaintiff suffered a serious medical need.

As noted *supra*, the subjective component of an Eighth Amendment claim requires that a plaintiff establish that the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). Defendant first argues that plaintiff has failed to establish the subjective component of his claim because "[c]ourts have consistently held that prison medical doctors who discontinue prescribed medication after an inmate is caught hoarding the medication are not deliberately indifferent." *Defendant's Motion*, pp. 36-40. Defendant also argues that the cancellation of plaintiff's May

13

31, 2011 appointment in Doctor's Sick Call does not amount to deliberate indifference because plaintiff refused diagnostic testing, failed or misused pain medication, and failed to participate in Recovery Services even though his participation was a condition of his continued receipt of pain medication and even though he had agreed that he would not receive another chance. *Defendant's Reply*, pp. 12-15.

Plaintiff argues that "Dr. Shank knew that a variety of medications" "in addition to traditional pain medications," "were available to treat neuropathic pain" and that Dr. Shank's "failure to acknowledge other options undermines Dr. Shank's rationale for denying treatment." *Supplemental Response*, p. 3. Plaintiff also argues that "there is a dispute of fact regarding whether [plaintiff] complied with Dr. Shank's request" to participate in Recovery Services. *Id*. In this regard, plaintiff insists that he complied with the referral to Recovery Services because he attended a Recovery Services "consult," but "was found to be at an extremely low risk for addiction and not eligible for Recovery Services' mandatory program." *Id*. Plaintiff also complains that Dr. Shank was more lenient with private patients and more willing to believe the statements of his private patients, and suggests that Dr. Shank denied medical care to plaintiff in order to bolster his reputation in the face of a medical board investigation related to the doctor's prescription of pain medication to private patients. *Id*. at p. 5. Plaintiff characterizes Dr. Shank's denial of medical treatment to plaintiff on May 31, 2011, as punishment for the

14

August 2009 cheeking incident. *Id*. at p. 1. Plaintiff's arguments are not well taken.

Plaintiff was evaluated by Nurse Practitioner Gerhard in the Chronic Care Clinic on May 24, 2011, where he reported neuropathy pain that was spreading to his face. ECF 42-2, *PAGEID* 319. Although Ms. Gerhard saw no objective indicators of pain, *Deposition of Helen Gwendolyn Gerhard*, p. 6, she referred plaintiff to Dr. Shank "for [bottom bunk restriction] + pain meds + round trip for MRI for [diagnosis] of problem." ECF 42-2, *PAGEID* 318. Dr. Shank reviewed plaintiff's chart on May 31, 2011, and cancelled the referral to Doctor's Sick Call, noting the following: "MRI is not indicated in this pt. [with] known . . . peripheral polyneuropathy. Pt. has failed, misused, or been non-compliant [with] terms of Rxs for pain. There are no additional options available. Cancel [doctor's sick call]." *Id*. at *PAGEID* 320. Plaintiff disputes Dr. Shank's conclusion that plaintiff "has failed, misused, or been non-compliant" with the terms of his prescriptions for pain medication. However, the evidence supports Dr. Shank's conclusions.

Plaintiff was diagnosed with generalized sensory and motor peripheral neuropathy in September 2009. *Id*. at *PAGEID* 300. Plaintiff was treated with Tramadol and Gabapentin for his symptoms prior to being diagnosed with neuropathy, but those prescriptions were cancelled in August 2009 after plaintiff was found to be cheeking the medication. ECF 42-2, *PAGEID* 283-87. Plaintiff was prescribed Carbamazepine as an alternative but, in October 2009, he reported that this medication offered no benefit. *Id*. at *PAGEID* 300. Plaintiff

15

refused diagnostic testing in 2009 and 2010 because of pain, but stated that he would consider an MRI if Dr. Shank would prescribe Gabapentin.  *Id*. at *PAGEID* 303.  Plaintiff received no clear benefit from prednisone, *id*. at *PAGEID* 303, 308, and stated that indomethacin was "better than nothing."  *Id*. at *PAGEID* 307.  Dr. Shank concluded that plaintiff "failed alternative [treatment] options," and agreed to prescribe Gabapentin in crushed form.  *Id*. at *PAGEID* 307-09.  I prescribing this medication, Dr. Shank noted that plaintiff had agreed that he would not get another chance if he misused his medication and that plaintiff was willing to work with the polysubstance abuse program.  *Id*.  Dr. Shank ordered a substance abuse consult and restrictions to a low bunk; no lifting greater than 20 pounds; no standing longer than 30 minutes; and no pushing, pulling, or bending for six months.  *Id*.  Dr. Shank's referral to Recovery Services states the following: "Pt. [with] peripheral polyneuropathy, apparently familial.  Pt. misused gabapentin and tramadol [approximately] 1 y ago, selling for cookies.  He has cooperated [with] alternative [treatments,] [illegible] failed.  He has agreed to crush order for gabapentin and to be evaluated and, if appropriate, monitored by you."  *Id*. at *PAGEID* 310.

 Plaintiff was interviewed at Recovery Services on July 6, 2010, and was referred to educational programming, but he did not attend that programming.  *Id*. at *PAGEID* 325-26; *John T. Hall Deposition*, pp. 26-27.  Dr. Shank reviewed plaintiff's file in March 2011 and noted that he did "not have documentation of compliance [with] Recovery Services."  ECF 42-2, *PAGEID* 313.  Upon his inquiry, Dr. Shank was

16

informed that plaintiff had not "been compliant with Recovery Services." *Id*. at *PAGEID* 323. Mr. Schweyer confirmed that a referral to Recovery Services had been received and that plaintiff had been screened by Recovery Services, but that plaintiff "wanted nothing to do with Recovery Services" and "did not see himself as having a problem," despite "two positive urine screens since he has been incarcerated." *Id*.

Plaintiff's prescription for Gabapentin was actually cancelled by Nurse Practitioner Gerhard on April 13, 2011, when plaintiff refused to accept a lower dose of the medication, stated that Gabapentin "was not effective in relieving his pain at the current dosages anyway," and asked that his prescription be cancelled. *Id*. at *PAGEID* 315-16. On April 26, 2011, Dr. Shank noted that, according to Recovery Services, plaintiff had refused to participate in the program even though his participation was a condition of his continued treatment with Gabapentin and even though he had agreed that he would not receive another chance. *Id*. at *PAGEID* 313. Dr. Shank noted at the time: "Pt. reportedly does not perceive a substance abuse problem despite 2 separate urines [positive] for cocaine. No further gabapentin." *Id*. *See also PAGEID* 318 ("No further gabapentin – do not restart.").

In short, the evidence supports Dr. Shank's conclusion that plaintiff had failed, misused, or been non-compliant with the terms of his prescription for pain medication. Plaintiff had misused Gabapentin, alternative treatments had failed, and plaintiff had refused to undergo diagnostic testing, and had not participated in

17

Recovery Services even though that participation was a condition of his further receipt of Gabapentin. Although plaintiff contends that he complied with the referral to Recovery Services, Dr. Shank specifically inquired as to plaintiff's compliance and was informed that plaintiff had not complied with the referral to Recovery Services. Under these circumstances, Dr. Shank's refusal to prescribe pain medication on May 31, 2011, simply does not constitute deliberate indifference to plaintiff's serious medical needs. *See e.g.*, *Atakpu v. Lawson*, No. 1:05-CV-00524, 2008 WL 5233467, at *11 (S.D. Ohio Dec. 11, 2008) ("In a prison setting, the decision to discontinue a pain medication because of concerns of abuse of such medication does not amount to deliberate indifference to serious medical needs.").

Plaintiff also argues that Dr. Shank's refusal to prescribe pain medication on May 31, 2011, was not based on his medical judgment, but on a desire to bolster his reputation in the face of a medical board investigation related to his alleged overprescribing pain medication to private patients. In this regard, plaintiff contends that Dr. Shank was more lenient with his private patients and more willing to believe their statements. *Supplemental Response*, p. 5. According to plaintiff, Dr. Shank adopted strict policies when prescribing pain medication to inmates after he was investigated for overprescribing pain medication in his private practice. *Id.*; *Plaintiff's Response*, pp. 36-41. "The refusal to treat [plaintiff] and the pretextual reasons given for it, when combined with his leniency towards his private pain management patients, raises the inference that Dr. Shank's denial of treatment was not about his professional medical

18

judgment but about his deliberate indifference to [plaintiff's] pain." *Supplemental Response*, p. 5.

However, even if plaintiff's contentions in this regard are true, (*i.e.,* that Dr. Shank adopted strict policies for prescribing pain medication to inmates after he was investigated for overprescribing pain medication, and that he did so in order to bolster his image before the medical board), the evidence nevertheless demonstrates that Dr. Shank was not deliberately indifferent to plaintiff's serious medical needs. No reasonable jury could find that Dr. Shank did not have a subjective good-faith belief that plaintiff had misused or had been non-compliant with the terms of his prescription for pain medication. The fact that Dr. Shank may have been less lenient in his pain medication prescription practices for inmates than he had previously been for his private practice patients does not alter this conclusion.

In short, plaintiff has not raised a genuine issue of material fact and Dr. Shank is entitled to summary judgment as a matter of law. It is therefore **RECOMMENDED** that *Defendant, Dr. Myron Shank's Motion for Summary Judgment*, ECF 42, be **GRANTED.**

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections

19

must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


July 10, 2015                                       *s/Norah McCann King*
                                                 Norah M<sup>c</sup>Cann King
                                           United States Magistrate Judge